# FOR FILING UNDER SEAL

**DUANE MORRIS LLP**
Lawrence H. Pockers (PA No. 84589)
Sarah O'Laughlin Kulik (PA No. 318534)
Nina Kalandadze (PA No. 329064)
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Fax: (215) 979-1020
Email: lhpockers@duanemorris.com
sckulik@duanemorris.com
nkalandadze@duanemorris.com

**MCKOOL SMITH, P.C.**
Jon Corey (D.C. Bar No. 491311)
(*pro hac vice* forthcoming)
1717 K Street NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 370-8300
Fax: (202) 370-8344
Email: jcorey@mckoolsmith.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARAMARK SERVICES, INC. f/k/a ARAMARK CORPORATION; ARAMARK SERVICES, INC. GROUP HEALTH PLAN; ARAMARK UNIFORM SERVICES GROUP HEALTH AND WELFARE PLAN; and ARAMARK BENEFITS COMPLIANCE REVIEW COMMITTEE, | CIVIL ACTION NO. ___________ |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| QCC INSURANCE COMPANY D/B/A INDEPENDENCE ADMINISTRATORS; INDEPENDENCE BLUE CROSS; and INDEPENDENCE HEALTH GROUP, INC., | **COMPLAINT** |
| Defendants. | |

## COMPLAINT

Plaintiffs Aramark Services, Inc. f/k/a Aramark Corporation; Aramark Services, Inc. Group Health Plan; Aramark Uniform Services Group Health and Welfare Plan; and Aramark Benefits Compliance Review Committee (collectively, "Aramark" or "Plaintiffs"); by and through their undersigned counsel, submit this Complaint against QCC Insurance Company d/b/a Independence Administrators; Independence Blue Cross; and Independence Health Group, Inc. (collectively, "Independence" or "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1. Aramark entrusted Independence with over $600 million to pay doctors, hospitals, and other medical providers that cared for Aramark employees, retirees, and their families. Independence breached that trust. Independence frequently and consistently used Aramark funds to pay false, fraudulent, or otherwise improper provider claims for payment. Independence deprived Aramark of any visibility into how Independence used these funds. Independence also charged Aramark excessive, unreasonable, and undisclosed fees. Independence failed to take responsibility for its acts and omissions, so this complaint follows.

2. In 2018, Aramark engaged Independence to administer the Aramark Services, Inc. Group Health Plan and Aramark Uniform Services Group Health and Welfare Plan (the "Plans") covering Aramark's thousands of employees nationwide, as well as their family members and other eligible beneficiaries ("Plan Participants"). The Plans are organized and operated under the Employee Retirement Income Security Act ("ERISA").

3. Aramark, like other large employers, self-funds its medical benefits plans. And, like other large employers, Aramark lacks the expertise to administer the details of medical benefit plans: process provider claims for payment; screen for false, fraudulent, or improper claims; interact with healthcare providers; determine how much providers should be paid; and remedy

overpayments. Aramark delegated these fiduciary responsibilities to Independence. Independence accepted this responsibility as a third-party claims administrator or "TPA."

4. As a TPA, Independence had contractual, fiduciary, and statutory obligations to properly process and pay provider claims for payment and prevent healthcare fraud, waste, and abuse. Independence owed Aramark an affirmative duty to exercise "care, skill, prudence and diligence" in properly paying claims, as well as identifying and denying fraudulent, improper, or otherwise illegitimate claims.

5. As a TPA, Independence committed to pay properly adjudicated claims from the Plans' accounts through duly granted authority, as ERISA requires. Independence should have preserved the Plans' assets for the benefit of the Plan Participants and only used those assets to pay legitimate claims for health benefits.

6. In practice, however, Independence abused its authority to enrich itself to Aramark's detriment. Independence's failure to perform its basic obligations breached its fiduciary duties and breached its contractual obligations. In addition, Independence took money from Aramark under the guise of claims administration, transferred the money to accounts under Independence's control, paid some of that money to providers to settle the claims, and kept the difference in the form of undisclosed, improper, and unreasonable fees. Independence never refunded or credited the difference to the Plans.

7. Independence took steps to conceal the breaches of its fiduciary and contractual obligations. For example, it limited Aramark's audit rights, it provided false or inaccurate information to be included on Aramark's annual Form 5500 filed with the Department of Labor and provided incomplete and misleading reports. These actions made it impossible for Aramark

to obtain or access data about the actual financial transactions between Aramark, Independence, and the healthcare providers.

8. Independence's breaches of contract and fiduciary duties have cost Aramark tens of millions of dollars. Aramark brings this action to address the harm caused by Independence's wrongful conduct and to enjoin Independence from continuing to engage in this wrongful conduct to Aramark's detriment.

**PARTIES**

9. Plaintiff Aramark Services, Inc. is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Aramark Services, Inc. is a global provider of food, facilities and uniform services to education, business & industry, and sports, leisure & corrections clients with thousands of employees in the United States.

10. Plaintiffs Aramark Services, Inc. Group Health Plan and the Aramark Uniform Services Group Health and Welfare Plan (collectively, the "Plans") are welfare benefit plans organized and operated under ERISA.

11. Aramark Services, Inc. sponsors and is the principal funding source for the Plans, which are welfare benefits plans organized and operated under ERISA.

12. Aramark Services, Inc. established the Plans to provide certain benefits, including healthcare coverage for its employees, retirees, and eligible beneficiaries ("Plan Participants").

13. Plaintiff Aramark Benefits Compliance Review Committee (the "Committee") was established by Aramark Services, Inc. to act as the plan administrator and designated ERISA fiduciary for both Plans.

14. Defendant Independence Health Group, Inc. ("IHG"), a parent company or affiliate of IBX and QCC, is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

15. Defendant Independence Blue Cross ("IBX"), a parent company or affiliate of QCC, is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

16. Defendant QCC Insurance Company d/b/a Independence Administrators ("QCC"), is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. On information and belief, QCC has no employees of its own and instead is managed and operated by IBX employees and third-party contractors.

17. QCC is licensed by the Pennsylvania Insurance Department to provide applicable services in the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

18. Pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 1132(e)(1), 1451(c), this Court has jurisdiction over this civil action asserting claims arising under ERISA.

19. The Court has personal jurisdiction over this matter because the Aramark parties and the Independence parties have their principal places of business in Philadelphia, Pennsylvania. The parties contracted that their agreements at issue will be governed, construed, and enforced under the laws of the Commonwealth of Pennsylvania, and all disputes arising therefrom will be resolved in state or federal district court located in Philadelphia, Pennsylvania. *See* Ex. 1 at 22; Ex. 2 at 18-19.

20. The ANSC contains language that permits, but does not mandate arbitration. Regardless, arbitration is not appropriate because, under the ANSC, the parties agreed not to grant any arbitrator the authority to grant equitable and non-monetary relief, the only relief Aramark seeks in this Complaint.

21. Venue is proper in this District pursuant to 29 U.S.C. §§ 1132(e)(2), 1451(d) and 28 U.S.C. § 1391(b) because the Plans are administered in this District; the Defendants reside, do

business, and are found in this District; and a substantial part of the events and omissions giving rise to the claims occurred in this District. Further, Independence has and continues to contract, adjudicate, and pay for medical services rendered to Plan Participants in the District. Independence has committed intentional acts that were intended to cause and did cause injury to Aramark in the District.

## BACKGROUND

### A. Aramark Entrusted Independence with the Administration of its Plans

22. Aramark lacks the expertise to evaluate claims for payment submitted by healthcare providers that cared for its Plan Participants—a process called claims adjudication. Aramark delegated that responsibility to Independence. Aramark conducted a competitive request for proposal and bid process. During that process, Independence made representations regarding its competence and expertise to Aramark's employees and committee members responsible for hiring a health insurance company as a claim fiduciary. Aramark selected Independence as one of the Plans' TPAs and fiduciaries because Independence represented its expertise evaluating claims for payment submitted by providers for adherence to the Plans' coverage and reimbursement policies and industry-standard coding guidelines dictated by the Centers for Medicare and Medicaid Services ("CMS") and the American Medical Association ("AMA").

23. According to its website, IBX "is the leading health insurance company in southeastern Pennsylvania, and with [its] affiliates [serves] more than 8 million people nationwide." *See* https://www.ibx.com/about-us/our-company. IBX "provide[s] specialty services and products, including third-party benefits administration." *Id*. According to its website, IBX was not only aware of QCC's policies and practices in performing its role as the TPA of the Plans but actually developed it to "make the health care experience more convenient, effective,

and affordable." As such, IBX and QCC were complicit, and each profited from the harm that IBX's TPA policies and practices caused Aramark.

24. As a TPA, Independence does not provide traditional medical insurance to Aramark employees or retirees. Independence does not pay medical expenses for Plan Participants in exchange for premiums. Rather, Aramark retains the financial risk of increased medical expenses by agreeing to pay the medical expenses incurred by the Plan Participants directly from funds of the Plans. In other words, Aramark self-funds its employees' medical expenses (with contributions from some employees in certain circumstances).

25. In 2018, Aramark and QCC entered into an Administrative Services Agreement (the "Aramark ASA") wherein Independence agreed to "review and determine whether benefits are payable, and pay or deny claims for services incurred" under the Plans, in exchange for a monthly fee. Ex. 1, Aramark ASA at 5. In 2022, Aramark, QCC, and IBX entered into a largely similar agreement entitled Administrative and Network Services Contract (the "Aramark ANSC"). In 2024, Aramark and QCC entered into a renewal agreement, effective 2025 (the "Aramark Renewal," together with the "Aramark ANSC", and "Aramark ASA," the "Aramark Agreements").

26. In the Aramark ASA, Independence agreed to be the claims fiduciary:

> Independence is the named claims fiduciary. Independence accepts responsibility as the named claims fiduciary for all benefit determinations, all claims payments, and for all levels of member appeals when return on recoveries is included. Independence will have the final decision making and final discretionary authority as the named claims fiduciary for all benefit determinations, all claims payments, and for all levels of member appeals.

Ex. 1 at 36.

27. In the Aramark ANSC, Independence agreed to be the claims fiduciary:

> [QCC], as named claims fiduciary of the Plan, will have the authority to exercise discretion to . . . make a Determination with respect to each Claim as soon as

> practicable following receipt of such Claim . . . through its periodic reporting procedures, notify the Plan Sponsor of its Determination with respect to each Claim . . . pay the amount it determines is due on account of such Claim . . . [and] take steps set forth in the Plan with regard to denied Claims.

Ex. 2, Aramark ANSC at 24-25.

> "Determination" means, with respect to each Claim, a decision by Independence Administrators as to whether and to what extent such Claim shall be paid, subject to the review and final determination of the Plan Sponsor.

Ex. 2 at 2.

28. In the Aramark Renewal, Independence again agreed to be the claims fiduciary:

> Independence Administrators will have the final decision making and final discretionary authority as the named claims fiduciary for all benefit determinations, all claims payments, and for all levels of member appeals.

Ex. 3 at 10.

29. Independence's decision-making authority under the Aramark Agreements went far beyond mere application and compliance with its own guidelines. Because Independence exercises discretionary authority and control respecting management of the Plans and distribution of Plan funds, the administration of the Plans, and the management and disposition of assets dedicated to the Plans, Independence is a functional fiduciary as well as a named ERISA fiduciary. *See Cohen v. Indep. Blue Cross*, No. CIV.A. 10-4910 MAS, 2012 WL 6626131, *8 (D.N.J. Dec. 19, 2012) (finding Independence, acting as a TPA, was a plan's fiduciary because the plan documents identified Independence as a "claims fiduciary," and Independence exercised discretionary decision-making authority); *Briglia v. Horizon Healthcare Servs., Inc.*, No. CIV.A.03-6033 FLW, 2005 WL 1140687, at *6 (D.N.J. May 13, 2005) ("[T]he linchpin of fiduciary status under ERISA is discretion.") (citing *Curcio v. John Hancock Mutual Life Ins. Co.*, 33 F.3d 226, 233 (3d Cir. 1994)).

30. As a "named claims fiduciary," Independence "accept[ed] responsibility as the named fiduciary for all benefit determinations." Ex. 1 at 36. Specifically, and by way of example, Independence agreed to exercise "discretionary authority" over "all benefit determinations, all claims payments, and for all levels of member appeals." *Id.*; *see also* Ex. 2 at 24-25.

31. As a fiduciary, Independence agreed to be responsible for processing and reviewing claims for health benefits by Plan Participants, including: (i) the eligibility of each claimant under the terms of the Plans, (ii) the eligibility of the claim for health benefits under the terms of the Plans, (iii) whether the health services for which health benefits are sought are Medically Necessary and Appropriate, and (iv) the basic legitimacy of the claim, *i.e.*, whether the claim is fraudulent or otherwise improper. Independence exercises discretion in carrying out its responsibilities.

32. As a fiduciary, Independence agreed to be responsible for the approval and payment of only those claims that are legitimate, *i.e.*, not those that are false, fraudulent, improper, or otherwise fail to satisfy the requirements of the Plans. This requires Independence to employ efforts to combat fraud, waste and abuse in the Plans that are at least as stringent as its efforts with its fully insured insurance plans.

33. Independence likewise exercises discretion with respect to recovery of overpayments on medical claims. As a fiduciary, Independence has an affirmative obligation to seek recovery of any fraudulent, illegitimate, or erroneous payments Independence made with Plan funds. In other words, if Independence pays false, fraudulent or illegitimate claims, then it has an affirmative obligation to seek recovery of those payments on behalf of the Plans.

> If it is determined that any payment has been made by [Independence] to an ineligible recipient or that more than the proper amount has been paid to any Subscriber or Provider entitled to benefits, [Independence's] sole responsibility will be to take reasonable steps to recover the incorrect payment or overpayment. . . .

Ex. 1 at 11; *see also* Ex. 2 at 6 (similar).

34. As a fiduciary, Independence is also responsible for providing subrogation and reimbursement services. Under the Aramark Agreements, Independence undertook the obligation to pursue reimbursement of monies legally owed to the Plans. "[Independence] will provide subrogation services for [Aramark]." Ex. 1 at 6; Ex. 2 at 7. "Independence Administrators shall make reasonable efforts to secure the reimbursement of funds disbursed from the Account in error." Ex. 2 at 9.

35. Independence had to exercise its discretion as an ERISA fiduciary. Aramark was entirely at Independence's mercy when it came to the administration of its claims. Aramark had no role in Independence's decisions to approve or deny claims.

36. After Independence approves a claim for payment, Independence caused the claim to be paid with funds transferred from the Plans into accounts controlled by Independence. Neither the Plans nor Aramark have any role in Independence's decision to approve or deny claims or in Independence's decision to pay any particular amounts for approved claims. *See* Ex. 1 at 5. Rather, Aramark relies on Independence to properly process, review and adjudicate claims for health benefits. Independence is uniquely positioned to make and exercise discretionary authority or control over plan management, including the right to change unilaterally the value of a fee or rate paid. Independence is further afforded broad flexibility in determining its course of action in administering the Plans. Aramark relies on Independence to process, review and adjudicate claims for health benefits properly. Aramark relies on Independence to pull from the Plans only the amount of money for claims expense that is actually paid to providers.

37. As a fiduciary of the Plans, Independence must exercise "care, skill, prudence and diligence" to identify, deny, and prevent the payment of false, fraudulent, or improper provider-

submitted claims or other claims that do not satisfy the eligibility and other requirements of the Plans.

38. As a fiduciary, Independence is prohibited from siphoning funds, *i.e.* undisclosed and unreasonable fees, taken from the Plans under the false pretense that it was paying claims for medical services. For example, at no point has Independence disclosed to Aramark the actual type or amount (even a rough estimate), of the amounts it pays itself from the claim payment funds or the type and amounts of revenue it receives from third parties when it acts as Aramark's fiduciary.

39. Independence breached its fiduciary duties by approving and paying false, fraudulent, and improper claims and withdrawing undisclosed fees from the funds Independence extracts from the Plans to pay those providers that cared for and treated Plan Participants.

40. Notwithstanding its fiduciary obligations to investigate all types of fraud using the latest detection, investigation, and recovery techniques, which it does for claims under its own, fully insured plans, Independence approved and paid millions of dollars of claims with the Plans' assets that never should have been paid. In most instances, the wrongfully paid claims were paid automatically, almost immediately, and with no review.

## INDEPENDENCE'S WRONGFUL CONDUCT

### A. Independence Does Not Provide the Plans with Medical Claims Data

41. Federal regulations require that participants in the health care system, *e.g.*, providers, health plans, and insurers, exchange information regarding enrollment, eligibility, billing, claim status, adjustments, adjudication, and payment using specifically defined electronic data sets. Claims processing and payment is governed by the Health Insurance Portability and Accountability Act ("HIPAA") Administrative Simplification regulations. *See* 45 C.F.R. § 162.920(a). HIPAA requires "covered entities" to comply with all HIPAA transaction standards, operating rules, and code sets. *See* 45 C.F.R. §§ 160.103, 162.100. Independence is a "covered

entity" as that term is defined in Title 45 of the Code of Federal Regulations. These regulations require that the electronic data sets be used to send and receive the medical claims data in the X12 5010 standard. The Department of Health and Human Services has adopted the following EDI data set standards by regulation:

42. Eligibility and Benefits [270 and 271 transactions]. "The request transaction, known as the X12 5010 270 transaction for inquiries about eligibility and benefits, . . . can be sent from a health care provider to a health plan, or from one health plan to another[.] The response transaction, known as the X12 5010 271 transaction for health plan, responds to inquiries about eligibility/benefits[.]" *See* Health Plan Eligibility and Benefits Transaction Basics, available at https://www.cms.gov/files/document/health-plan-eligibility-and-benefits-transaction-basics.pdf ("These standards apply to all HIPAA-covered entities—health plan (including Medicare and Medicaid), clearinghouses, and certain health care providers that conduct the adopted transactions electronically—not just those that work with Medicare or Medicaid.").

43. Payment / Invoicing / Coordination of Benefits [837 transaction]. The 837 file is the electronic invoice that the medical provider submits to the insurance company for reimbursement. The 837 contains information on insurance claims and includes data about the patient's treatments (such as the healthcare services delivered), the cost of medical care, and any modifications.

44. HHS adopted the X12 837 standard for coordination of benefits ("COB"). This standard applies to all HIPAA-covered entities—health plans, clearinghouses, and providers. The 837 standard supports two options for conducting COB transactions: either between health plans and other payers, or from health care providers to health plans. *See* Coordination of Benefits Transactions Basics, available at https://www.cms.gov/files/document/coordination-benefits-transactions.pdf.

45. Claim Status [276 and 277 transactions]. "The 276 is the transaction for provider inquiries about claim status. The 277 transaction for health plan responses about claim status." *See* Claim Status Basics, available at https://www.cms.gov/files/document/claim-status-transactions.pdf.

46. Claims Payment and Explanation [835 transaction]. The 835 is the digital transaction that delivers claim payment details from the insurer to the provider. The 835, like the 837, contains information such as what medical care is being reimbursed, and for what amount. If the billed amount has been lowered or altered, the 835 also contains an explanation for any such adjustment. The 835 also offers insurance details such as deductibles, co-pay amounts, healthcare claim splitting, co-insurers, and bundling. "The adopted standard for ERA [Electronic Remittance Advice] transactions is X12 835 5010. Accredited Standards Committee X12 Health Care Claim Payment/Remittance Advice (835), Version 005010X221 and its associated Errata Documents [ ], the standard for data content of the CCD+Addenda Record." *See* EFT and ERA: Electronic Funds Transfer and Electronic Remittance Advice Transactions Basics, available at https://www.cms.gov/files/document/electronic-funds-transfer-and-electronic-remittance-advice-transactions.pdf.

47. As a covered entity, Independence should have complied with the HIPAA regulations.

48. Consistent with the applicable regulations, Independence employed the X12 5010 standard transaction data sets when it processed Aramark's employees' medical claims.

49. In addition to payors, *i.e.,* self-funded health plan and health insurance companies, and providers, "EDI clearinghouses" play a critical role in enabling the electronic transmission of medical claims. *See United States v UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 124 (D.D.C.

2022). "In 2021, 97 percent of medical claims were submitted electronically, and 95 percent of providers and 99 percent of insurers used EDI clearinghouses" to process those transactions. *Id.* 125. A substantial amount of medical claims data flows through EDI clearinghouses—covering "the entire lifecycle of a claim—both pre- and post-adjudication." *Id.* "Pre-adjudicated claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts"; "[p]ost-adjudicated claims data [ ] include[s] even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions." *Id.*

50. In practice, the medical claim submission and claim process works as follows: After a provider treats a patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form (professional) or CMS-1450 Health Insurance Claim Form (facility) is prepared. These forms are essentially a bill, invoice, or claim, prepared by the providers and submitted to Independence. In parallel, the information in these forms is usually translated into a specific, regulation-required ANSI X12 5010 format EDI data, the 837. As has become customary in the industry, providers transmit the EDI bill electronically to Independence.

51. Independence publishes companion guides that provide instructions for electronic communications and supplemental information for creating transactions while ensuring compliance with ASC X12 instructions.

52. Once the forms or 837 are transmitted to the insurance company, then the insurance company must acknowledge receipt within two days.

53. If Independence accepts and processes the transaction (claim(s) and incurred charges), then it generates a document known as an "Electronic Remittance Advice" or an "835,"

which is a record of claims adjudication or adjustment and payment for the submitted claim. An 835 is not a rejection of the claim. The 835 is then required to be transmitted to the provider's office and maintained by Independence in the standard or original format for auditability.

54. If Independence rejects a claim, then it does not generate an 835. Rather, it generates an EDI data record referred to as a "999" and transmits that to the provider's office. A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00.

55. When a provider bills Independence for services or treatment, they follow the industry standard service and treatment codes, including Current Procedural Terminology ("CPT") codes, Diagnostic-Related grouping ("DRG") codes, and International Classification of Diseases ("ICD") codes.

56. Independence did not provide Aramark with the standard transaction data sets for the medical claims Independence processed that Aramark was directed to pay. In fact, as of the date of filing this complaint, *Independence has not provided Aramark or its authorized vendors with industry-standard and regulatory required standard medical claims and payment data sets.* Independence has failed to satisfy its contractual obligations to provide requested claims data.

57. Aramark owns this data and has an absolute right to it.

### B. Independence Breached Its Fiduciary Duties and the Standard of Care Required by the Agreements

58. Aramark paid Independence to police its claims. Independence failed to do so. The limited, incomplete medical claims data that Aramark was able to obtain confirms Independence made tens of millions in estimated overpayments for claims containing abusive billing practices, obvious payment errors, impossible pricing outliers, and non-covered services. These practices are discussed below.

### 1. Independence Caused Aramark to Pay Unreviewed High-Value Claims and Facially Defective Claims

59. A basic claims administration function is to review high-value claims—specifically medical records—before the claim is paid. Independence does this when high-value claims are submitted for payment to its fully insured plans when its own money is at risk. Independence did not do this for over one hundred claims submitted for the care and treatment of Aramark plan participants.

60. Many of these claims were charged under high-cost revenue codes and paid without any review, much less an adequate review of medical records. Claims under high-cost revenue codes are usually hospital bills for seriously ill employees or retirees. Medical records review is necessary to ensure the claims submitted accurately reflect the care provided. It is impossible to obtain complete medical records within 14 days, or sometimes even 30 days. Yet, Independence regularly approved claims over $100,000 within 30 days of receipt.

61. In one egregious example, Independence approved one claim for $225,474 for "other implants" for a spine surgery within seven days of receipt.

### 2. Independence Paid Facially Incomplete Claims

62. Independence failed to exercise care prior to approving claims (a) with unlisted or erroneous CPT codes, (b) missing CPT codes, (c) missing or invalid diagnosis codes, (d) invalid or missing DRG codes, or (e) invalid or missing revenue codes. Claims with missing, invalid, unlisted, invalid, or unlisted codes should not be paid without further review of supporting medical records or other documentation or requiring the healthcare provider to submit correct or "clean" claims. Independence approved payment of hundreds of claims with these defects without medical record review or receiving corrected claims. Independence caused millions of dollars of claims to

be paid without review. Independence never subsequently reviewed or adjusted these defective claims.

**3. Independence Caused Aramark to Pay for Services Expressly Excluded from Plan Coverage**

63. Independence routinely approved claims for services that were not covered by the Plans. For example, the Plans do not cover untimely claims, cosmetic surgery, unnecessary telehealth services, and certain chiropractic services. Independence was aware of these limitations because Independence employees assisted Aramark in preparing the documents provided to Plan Participants that identified treatments and procedures excluded from medical-insurance coverage.

64. Independence frequently used Aramark funds to pay for non-covered services or out-of-policy services, including cosmetic surgery, massage therapy, "maintenance" care, excluded vision services, and other such services. Independence approved payment for and paid over 2,300 claims for explicitly excluded services.

**4. Independence Caused Aramark to Pay Facially Inconsistent Claims**

65. Independence reviews and compares claims across the claim population to ensure they contain no inconsistent billings and are not duplicate claims or double-billed claims. It appears Independence failed to do this basic, industry-standard check when adjudicating Aramark claims.

66. Independence appears to have approved for payment and paid with Aramark funds thousands of duplicate, double-billed, identical, or double-service claims for the same services, from the same provider, for the same employee.

67. Independence likewise approved and processed claims containing clear errors when compared with other claims for or associated with the same patient's treatment. Such examples include hospitals billing additional or add-on services that the treating surgeon either did not do,

or are facially inconsistent with the surgeries and treatment the treating surgeon actually performed. Similarly, it is not uncommon to see assistant surgeons bill for services, surgeries, and treatment the primary surgeon did not perform or that are inconsistent with the surgeries and treatment the primary surgeon actually performed. In some instances, Independence approved payment of "assistant" surgeon claims when no corresponding claim for the "primary" surgeon exists. Such claims should be flagged for non-payment until the primary surgeon submits a claim, if ever. This type of crossclaim analysis is not limited to surgeries. Independence appears to have approved for payment and paid over 5,000 such claims.

### 5. Independence Caused Aramark To Pay Unjustifiably High-Priced Claims and Unnecessary Claims.

68. Independence's most basic function is to ensure Aramark does not pay unreasonable or unjustifiably expensive claims. Independence failed to do this, including the most basic of requirements, that Aramark should not pay *more* than the amount the healthcare provider billed. Yet, Independence caused Aramark to do so.

69. Similarly, Aramark expected to obtain the promised benefit of the provider discounts Independence claims to have negotiated with its participating providers. Independence regularly approved claims with extreme pricing variation relative to the amount the provider was regularly paid for the same services. Independence caused Aramark to pay over 400 claims that were unjustifiably and indefensibly high. These include claims in which the provider billed and was paid prices well in excess of both Medicare and commercial in-network prices for the care rendered. Independence used Aramark's funds to pay the vast majority of these claims automatically, often within days, without any review by Independence.

### 6. Independence Failed to Provide Subrogation Services

70. Independence agreed to provide subrogation services. A claim is subject to "subrogation" if another party, besides Aramark, is ultimately responsible for paying the medical services provided. For example, in the case of a car accident, the auto-insurance company responsible should pay, not Aramark. If the patient was treated for an "on-the-job" injury, then the responsible worker's compensation fund should pay for the care, not Aramark. Independence routinely failed to pursue subrogation when other parties were clearly responsible.

### 7. Independence Caused Aramark to Pay Thousands of Improper, False, or Fraudulent Claims

71. Aramark identified 1,253 claims as abusive excessive billing. In one instance, a provider engaging in a "pill mill" scheme prescribed large amounts of controlled substances on a monthly schedule followed by drug screening from one laboratory. Over a six-month period, Independence paid this provider more than $16,000 from one of the Plans for the treatment of a husband and wife. It is unlikely both the husband and the wife would share the same diagnosis, would require the exact same tests at each visit, and would need the exact same quantity of controlled substances.

72. Independence paid a psychiatric nurse practitioner more than $15,000 in payments over a twelve-month period, even though she regularly billed the highest level of evaluation and management code for weekly office visits. Generally, this highest level of evaluation requires 40-45 minutes with high quality decision making. Yet, on some dates of service she billed the highest level plus the next highest level of evaluation and management which requires 30-39 minutes with moderate level of medical decision making. She represented she spent at least three hours and fifteen minutes with the member or working on the member's case each day. Given the frequency of the visits, it is unlikely the provider rendered the necessary services to bill all the codes on the

dates of service. Independence made Aramark pay for services the member did not receive. Independence approved and paid these claims automatically and without review.

**8. Independence Caused Aramark to Pay for Unnecessary Lab Testing.**

73. Aramark identified 1,250 claims as abusive billing for COVID-19 tests, many of which relate to fraudulent billing of unnecessary add-on testing such as respiratory pathogen panel (RPP) tests, allergy tests, or genetic tests to confirm or rule out a diagnosis other than COVID-19. In one instance, a laboratory with a history of submitting false claims for lab services billed $25,691 in unnecessary add-on testing, which Independence approved. One government study concluded that labs engaging in the add-on billing scheme claims were, on average, reimbursed at $666 as opposed to $89 for providers billing only for the COVID tests.

**9. Independence Caused Aramark to Pay for Hundreds of Emergency Room "Super Users" Without Notifying Aramark.**

74. Independence regularly paid claims for emergency room ("ER") visits that were improper and abusive. ER overutilization and upcoding are increasing trends among health care services. For example, a high-level office visit costs $200; a non-emergency ER visit costs thousands of dollars. ER services accounted for about fifteen percent of the Plans' total annual spend. Studies have shown that a small percentage of "superusers"—members who have more than five ER visits in a year—drive these costs and even a small improvement in shifting habitual ER users to providers' offices or urgent care centers would have resulted in substantial cost reductions for Aramark. Aramark identified over 36 superusers Independence did not identify and for whom Independence paid claims with Plan funds without review.

### 10. Independence Caused Aramark to Pay for Rehabilitation Center Abuse

75. Aramark was the victim of a number of instances of a well-known fraudulent billing scheme known as the "Rehab Riviera," which Independence should have caught, but did not. To execute this scheme, unscrupulous operators of high-end rehabilitation facilities and their agents recruit people with addiction issues and good health insurance to travel from an in-patient substance-abuse rehabilitation facility to an in-patient substance abuse rehabilitation facility, each of which repeatedly bills the patient's health insurance company. The care provided at these facilities is rarely effective because its business model relies on returning patients or patients repeatedly rotating through loosely affiliated rehabilitation centers. In other words, for the scheme to work, the "rehabilitation" for which Aramark pays is designed to be ineffective.

76. The Orange County Register described the "scheme" as follows:

> Patient recruiters typically receive payment from the rehab centers for each patient that generates revenue. Predatory marketing practices often involve a misrepresentation of the services and the auctioning of patients through clearinghouses. The clearinghouses route the patients to call centers, and once the patient's insurance is verified, the clearing centers act as brokers auctioning off the patients to the highest bidding rehab centers. . . . Rehab operators have told to the Southern California News Group that they know it's wrong to offer money to middlemen in exchange for well-insured patients, but that the practice is so ubiquitous in California they'd have no patients at all if they stuck to the high ground. . . . Addicts start to see their insurance cards as credit cards, operators said, demanding better food, cell phones, even cash from providers in exchange for staying in treatment. If the provider doesn't deliver, the addict bolts to a different treatment center that will give him what he wants."[1]

---

[1] *Rehab Patient Brokering is Rampant, but It's Hard to Stop, Industry Says*, ORANGE CNTY. REG. (May 30, 2017), *available at* https://www.ocregister.com/2017/05/30/rehab-riviera-in-addiction-industry-even-simple-fixes-are-hard/; *How Many Body Brokering Cases Have Been Prosecuted by the Feds Under New Law*, ORANGE CNTY. REG. (Mar. 12, 2020), available at https://www.ocregister.com/2020/03/12/how-many-body-brokering-cases-have-been-prosecuted-by-the-feds-under-new-law/.

77. On Independence's watch, providers pulled $475,747 from the Plans in abusive billing for substance abuse treatment. In one instance, Independence paid for a plan member to receive treatment at nine separate rehabilitation facilities in Florida, California, Colorado, and Massachusetts over a 12-month period, even though multiple in-network rehabilitation programs exist within 25 miles of member's home zip code.

### C. Independence Engages in Post-Adjudication Adjustments Which Harm Aramark

#### 1. Independence Engages in Cross-Plan Offsetting

78. Independence engaged in cross-plan offsetting while serving as TPA for Aramark to the detriment of Aramark.

79. Cross-plan offsetting is a practice Independence has adopted and has been using for years. Cross-plan offsetting benefits Independence's fully insured plans at the expense of self-funded plans like these Plans.

80. To cross-plan offset, Independence overpays a provider using funds from the Plans. Rather than collect the overpayment back from the provider or provide a credit directly to the Plans, Independence deducts the overpaid amount from the "next" payment to the provider. Rarely, however, is the "next" payment from the Plans reduced. The reduced amount of the "next" payment does not benefit the Plans. Instead, that "next" payment comes from either another self-funded plan or, more frequently, Independence's fully insured plans. Therefore, another self-funded plan or Independence receives the benefit of the reduced payment amount, not the Plans.

81. For example, Doctor X treats an Aramark employee. Doctor X submits a claim for payment to Independence for $1000 with Aramark funds. Independence reviews the claim and pays Doctor X $1000 for the service. Independence later decides that it should have paid Doctor X $600. Independence does not ask Doctor X for a refund. Rather, Independence waits until

Doctor X treats a different patient covered by one of Independence's fully insured plans. For treating a fully insured patient, Doctor X submits a claim to Independence for $1000. Independence decides Doctor X should be paid $600. Rather than paying Doctor X $600 for treating the second patient, Independence deducts the $400 overpayment made with Aramark funds and pays Doctor X $200 for the second patient. Independence keeps the $400 and never refunds or credits Aramark the $400 that Independence saved. Independence uses cross-plan offsetting to get self-funded plans to subsidize Independence's fully insured book of business. Independence never discloses the $400 to Aramark.

82. Independence benefits from cross-plan offsetting to the detriment of the Plans. Cross-plan offsetting breaches Independence's fiduciary and contractual obligations to the Plans. At no point has Independence identified the amount of Aramark funds Independence used to benefit either its own fully insured plans or other self-insured plans, if any.

83. Independence conceals its cross-plan offsetting practice. Independence did not disclose to Aramark until the ANSC agreement that the Plans' funds would be used to offset overpayment that Independence makes with its own funds or funds from other medical benefit plans. At no point has Independence disclosed the amount of Plan funds taken to subsidize Independence's own fully insured offerings or other self-funded plans. Claim funding requests Independence submits, for example, explicitly and impliedly represent that the funds being requested from Aramark are to pay claims exclusively for services rendered to Aramark Plan Participants. Independence specifically submits weekly "Claims Summary Invoices" that contain line items including "Medical Claims Paid." Aramark relies on those funding requests to deliver plan assets to Independence, a fiduciary, with the expectation that those plan assets will exclusively benefit Plan Participants. Unbeknownst to Aramark, however, Independence siphons a portion of

those funds to reimburse Independence for overpayments it made in connection with its fully insured plans—a prohibited transaction under ERISA—and to reimburse other self-funded plans for overpayments Independence made on behalf of those self-funded plans. Independence has not disclosed to Aramark the amount of Aramark plan assets that were used to benefit either Independence or other self-funded medical benefit plans.

84. To perpetuate this undisclosed practice, Independence sends factually false Explanations of Benefits to Plan Participants. *E.g.*, 29 C.F.R. § 2560.503-1(g). Consistent with the funding request, the Plan Participant receives an Explanation of Benefits representing that Aramark paid the provider $1,000, using the example above. If, however, the doctor received an overpayment as identified by Independence that is subject to an offset in connection with the service provided to the plan participant, then the doctor will receive less than the $1,000 represented as being paid on the Explanation of Benefits. Independence provides an explanation of payment to the doctor, however, showing the offset. These post-adjudication adjustments appear in the Provider Adjustments ("PLB") segments of the claim-specific electronic remittance advice Independence creates for each claim. Independence does not provide this provider level adjustment information to Aramark, but conceals it.

### D. In Direct Violation of ERISA, Independence Commingles the Plans' Funds with Its Own Funds

85. For many of these schemes to work, Independence moved funds from the Plans' accounts into Independence's own account containing Independence's funds and the funds of other Plans. Because Independence is an ERISA fiduciary, such commingling was not permitted.

86. As a TPA and an ERISA fiduciary, Independence was supposed to make payments from an account owned and controlled by the Plans. Independence was supposed to write checks from or make ACH transfers from the Plans' accounts to a doctor or hospital that cared for a

beneficiary of the Plans in accordance with its fiduciary duties prescribed by 29 U.S.C. § 1104(a)(1)(B).

87. In practice, that did not happen. Independence directed the Plans to fund their accounts in certain bulk and undifferentiated amounts. Independence transferred funds from the Plans' accounts not to providers, but to an account or accounts owned and controlled by Independence or one of its affiliates. Independence then made payments to providers from the Independence account or accounts. The Plans had no access to these accounts, so they did not know—and had no way to determine—exactly how much the providers received for specific claims and whether that matched the amounts the Plans transferred to Independence for those specific claims.

### E. Independence Applies Less Rigorous Claims Adjudication Standards to Self-Funded Plan Claims Than It Applies When Adjudicating Claims for Its Own Fully Funded Plans

88. As an ERISA fiduciary, Independence is required to treat claims submitted to the Plans as it treats claims submitted to its fully insured plans. On information and belief, Independence does not do this. Independence applies rigorous standards for accepting, processing, and paying claims submitted to its fully insured plans where Independence is paying claims with its own money. As a result of applying these rigorous standards, on information and belief, Independence has a higher rejection rate for claims submitted to its fully funded plans than for plans for which it serves only as a TPA.

89. Independence touts its fraud resources online, proclaiming its expertise in identifying and preventing healthcare fraud, waste and abuse. According to Independence, "[n]ational estimates project that tens of billions of dollars are lost to health care fraud and abuse on an annual basis. These losses lead to increased health care costs and potential increased costs for coverage." *See Anti-Fraud | Independence Blue Cross*, *available at* https://www.ibx.com/anti-fraud.

Independence boldly asserts that it "takes the fight against health care fraud and abuse very seriously." *Id.*

90. Independence claims to fight fraud through "a department dedicated to preventing fraud and abuse: The Corporate & Financial Investigations Department (CFID)." *Id.* According to Independence, "CFID's mission is to detect, investigate, prevent, prosecute, and recover the loss of corporate and customer assets resulting from fraudulent and abusive actions." *Id.* The "CFID" is comprised of a "staff of trained professionals who carefully review all allegations of suspected fraud and abuse." *Id.*

91. On information and belief, Independence CFID resources are devoted disproportionally to claims submitted to Independence's fully insured book of business, to the detriment of self-funded plans, like Aramark's, that Independence administers.

92. When Independence is not responsible for paying claims with its own money and instead pays claims with money from self-funded plans, like the Plans, on information and belief, Independence applies less rigorous standards for accepting, processing, and paying claims submitted for payment. On information and belief, as a result, the claim rejection rate for a self-funded plan generally, and the Plans specifically, is lower than the claim rejection rate for Independence's fully insured plans. In addition, on information and belief, and assuming that Independence's payment patterns are like those of other health insurance companies for which data exists, Aramark paid more for a given treatment, care, service, or surgery generally than Independence pays for the same given treatment, care, service or surgery through its fully insured plans. *See, e.g.*, S. Craig, K. Ericson, A. Starc, *How Important is Price Variation Between Health Insurers?*, National Bureau of Economic Research Working Paper 25109 (October 2018),

*available at* https://www.sciencedirect.com/science/article/abs/pii/S0167629621000084?via%3Dihub.

93. By prioritizing its own assets and resources to the detriment of the Plans, Independence has breached and continues to breach its fiduciary duty to the Plans.

94. As part of the Aramark Agreements, Independence committed to recover overpayments; to make recoveries for subrogation and coordination of benefits; and to police fraud, waste, and abuse for the benefit of the Plans. Independence has specific departments devoted to these activities.

95. Independence did not apply the above-described fraud prevention investigations, techniques, and technology to identify and prevent the payment of fraudulent or otherwise improper claims made to the Plans, or did not apply those fraud prevention investigations, techniques, and technology as stringently as it did with claims made to Independence's own insurance plans.

96. Independence's failure to employ these fraud prevention investigations, techniques, and technology adequately, or to do so as stringently as it does with claims submitted to its own fully insured book of business, violates its fiduciary duty to "apply[ ] appropriate benefits in accordance with the relevant contractual documents and the information submitted." Ex. 1 at 66.

### F. Independence Actively Conceals Its Misconduct and Prevents the Plans from Discerning Whether Independence Correctly Processes Medical Claims

97. Independence has and continues to take affirmative steps to conceal its improper siphoning of Plans' funds, and prevents its customers, like Aramark, from having visibility into Independence's claim processing practices.

98. Independence is contractually obligated to provide "the necessary information to the Group in Order for the Group to complete Schedule C of Form 5500 to file with the U.S.

Department of Labor." Aramark routinely requested and received Department of Labor 5500 certification sheets from Independence that purported to show the compensation Independence received for the administration of the Plans. For years, Independence's certification sheets declared that Independence was not receiving any administrative compensation beyond what was permitted under the Agreements. Independence's certifications were inaccurate. The certifications misrepresented and concealed the fees Independence was charging the Plans. Independence was contractually obligated and required by the Department of Labor to accurately report its compensation for administering the Plans. Independence failed to do so.

99. Independence likewise misrepresented and actively concealed the fees it charged the Plans in the information provided pursuant to the Aramark Agreements. *See* Ex. 1 at 6; Ex. 2 at 6. Independence misrepresented the fees it was charging the Plans because Independence knew the fees were improper and it wanted to prevent Aramark from uncovering its scheme.

100. Independence's affirmative misrepresentations and active concealment effectively hid its misconduct and prevented Aramark from discovering the wrong.

101. Independence also has included in the Agreements "audit" provisions that prevent the Plans from assessing Independence's practices and from understanding how the Plans' money was actually spent. In practice, the terms of the "audit" provisions limited Aramark from full access to Independence's claim processing, by placing restrictions on Aramark's ability to conduct full audits, including, for example:

a. Independence presses the Plans to limit any audit sample to 200 claims. If Aramark wishes to audit more than 200 claims, Aramark is obligated to pay Independence $50 per additional claim audited.

b. The audit period is limited to eighteen (18) months from the scheduled audit.

c. Independence must approve the third party auditor chosen by the Plans.

d. The audit must be at Independence's location.

e. Independence has the right to review and respond to the draft audit report prior to its finalization.

f. No adjustments or refunds can be issued based on patterns, projections, or extrapolations identified in the report.

g. Independence will not produce provider remittances or contracts such that no auditor will be able to verify that payments actually received by providers were made consistent with a given provider's contract or were the amounts Independence represented to Aramark the provider would receive.

102. In other words, Independence deprives the Plans of any visibility into, much less a remedy for, any improperly processed but unaudited claims. The specific examples above demonstrate the patterns of misconduct that can be identified from a comprehensive review of the claims data cannot be discerned from a bare bones review of 200 claims, particularly when Independence processed over 200,000 claims for Aramark annually.

103. On information and belief, Independence did a comprehensive claim review for its own fully insured book of business and has retained third-party payment integrity firms to assist it with those reviews. Independence prevented Aramark from exercising those options.

104. Independence's pattern of concealment prevented Aramark from discovering that Independence failed to comply with duties and obligations that Independence owed to Aramark. Independence's conduct included:

a. Not providing Aramark access to the complete ANSI X12 Medical Claims data, despite the fact that the Medical Claims data belongs to Aramark;

b. Not disclosing Independence's practice of cross-plan offsetting;

c. Not disclosing that, as a result of separate contractual agreements with Independence, certain providers of medical services were not subject to review for overpayment or audit;

d. Not disclosing, or otherwise identifying, claims as subrogation eligible or those to which a third-party had primary responsibility, but were not pursued at the discretion of Independence;

e. Not disclosing, or otherwise identifying, claims that were likely overpayments that were not pursued or otherwise addressed at the discretion of Independence; and

f. Not disclosing information sufficient for Aramark to identify claims that should have never been paid, but which Independence paid in the first instance, only to "recover" those distributions as overpayments, along with an overpayment recovery fee.

**G. The Independence Entities Are Jointly and Severally Liable for the Harm Caused to Aramark**

105. IHG, IBX and QCC are jointly and severally liable for the harm alleged herein. Aramark contracted QCC to serve as the TPA of the Plans. IHG holds 100% of the controlling interest in AmeriHealth, Inc., which owns 100% of the controlling interest in IBX. IBX owns all issued and outstanding common stock of QCC. Since 2017, QCC distributed hundreds of millions of dollars of dividends to IBX. QCC has no board committees appointed by its board of directors and instead relies on committees appointed by IHG.

106. QCC is a contracting entity, nothing more. Effective July 1, 2014, QCC as well as other IBX affiliates, entered into a master services agreement whereby IBX provides QCC executive, administrative, legal, data processing, treasury, corporate secretarial, marketing, recordkeeping, reporting, purchasing, insurance, human resources, and tax services. Effective January 1, 2012, IBX entered into a Master Services Agreement with Highmark, Inc. for the benefit of IBX affiliates, including QCC, whereby Highmark provides benefits management services including member enrollment systems, group enrollment processing, benefit set-up, provider demographic and rate implementation, claims receipts and adjudication processing, data center hosting and support, electronic data interchange, clearinghouse services, and preparation of billing services. In other words, QCC has no employees of its own.

107. All services provided to Aramark are through employees of IBX or IHG. IHG and IBX provided services and facilities necessary for QCC to fulfill obligations owed to Aramark.

Employees of IHG and IBX rendered services to Aramark and supported QCC services rendered to Aramark. Aramark's interactions with Independence personnel were all IBX or IHG employees, who held themselves out as IBX or IHG employees. QCC possesses no material assets, including but not limited to the technical, computer, and software systems through which the claims by providers are submitted, are adjudicated, and are paid. All providers are required to submit claims to "Independence" or here "IBX," not to QCC. *See generally*, Independence Blue Cross HIPAA Transaction Standard Companion Guide (ver. May 2023). QCC has no contractual relationship with any provider within its designated area. The network agreements or agreements with participating providers are exclusively with IBX (or IHG).

108. QCC's misconduct, as alleged in this Complaint served to enrich its parent company, IBX. In fact, IBX "develop[s]" the "specialty services and products [provided by its affiliates], including third-party benefits administration." *See* https://www.ibx.com/about-us/our-company. IHG oversees the third-party administration services developed by IBX. In turn, IHG and IBX were not only aware of QCC's policies and practices in performing its role as the TPA of the Plans but were also complicit in QCC's breaches of contract and fiduciary duties as they actually participated in and controlled QCC's administration of the Plans.

109. The allegations of wrongdoing herein are entirely independent of Independence's participation in the BCBS Blue Card program. For the avoidance of doubt, this Complaint does not challenge Independence's participation in the Blue Card program or Blue Card fees Aramark may have paid.

## COUNT ONE

**Breach of Fiduciary Duty Under ERISA**
**(29 U.S.C. §§ 1104(a) and 1109(a))**

110. Aramark realleges and incorporates by reference each and every allegation contained herein.

111. Aramark brings this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a), and 1109(a). Aramark has standing to bring this Claim under these provisions as ERISA fiduciaries.

112. As the claims administrator to the Plans, Independence was an ERISA fiduciary and thus owed the Plans, Plan Participants, and Aramark a fiduciary duty to discharge its obligations to the Plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

113. Independence also owed a separate and independent fiduciary duty to discharge its obligations in accordance with the terms of the Plans' documents. *See* 29 U.S.C. § 1104(a)(1)(D).

114. Independence breached its fiduciary duties as set forth herein.

115. Independence further breached its fiduciary duties by approving claims for benefits that contained indicia of fraud or were otherwise improper or incomplete, without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent, and covered by the Plans.

116. Independence further breached its fiduciary duty by not recovering from providers' amounts paid pursuant to fraudulent or otherwise improper claims.

117. Independence's breach of its fiduciary duty resulted in improper payments of fraudulent or otherwise improper claims by Aramark on behalf of the Plans. These losses were ultimately suffered by Aramark.

118. Independence profited an undetermined amount due to its breach of its fiduciary duties.

119. Accordingly, Aramark seeks (i) the recovery of any and all losses resulting from Independence's breach of its fiduciary duty, (ii) the recovery of any and all benefit or profits Independence made as a result of its breach of its fiduciary duty, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Aramark's attorneys' fees and costs. These damages constitute "appropriate equitable relief" in the form of surcharge under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). *See CIGNA Corp. v. Amara*, 563 U.S. 421, 441-42 (2011).

**COUNT TWO**

**Prohibited Transactions Under ERISA**
**(29 U.S.C. §§ 1106(a)(1)(D) and 1109(a))**

120. Aramark realleges and incorporates by reference each and every allegation contained herein.

121. Aramark brings this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(a)(1)(D), and 1109(a). Aramark has standing to bring this Claim under these provisions as ERISA fiduciaries.

122. Independence was an ERISA fiduciary to the Plans, Plan Participants, and Aramark.

123. The health care providers and other parties to whom Independence made payments pursuant to claims for health benefits that it approved are "parties in interest" under ERISA because they provided or purported to provide "services" to the Plans.

124. By approving and paying fraudulent or otherwise improper or uncovered claims to such parties in interest, Independence engaged in "prohibited transactions" by causing the Plans to engage in transactions that Independence either knew or should have known constitute a direct or indirect transfer to or use by or for the benefit of a party in interest of assets of the Plans.

125. Neither the Plans nor Aramark received adequate consideration for the amounts that were paid for these prohibited transactions.

126. In addition, Independence retained for itself and transferred to itself monies from the Plans to which it had no lawful right. Independence further transferred some portion of Plans' money wrongfully retained or obtained to its affiliates, to its subcontractors, and to other third parties as compensation for their participation in the scheme, pattern and practices employed by Independence to obtain and retain monies from the Plans to which it had no lawful right.

127. Accordingly, Aramark seeks (i) the recovery of any and all losses resulting from Independence having engaged in prohibited transactions, (ii) the recovery of any and all benefit or profits Independence made as a result of having engaged in prohibited transactions, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Aramark's attorneys' fees and costs.

128. These damages constitute "appropriate equitable relief" in the form of surcharge under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). *See CIGNA Corp. v. Amara*, 563 U.S. 421, 441-42 (2011).

**COUNT THREE**

**Breach of Fiduciary Duty Under ERISA**
**(29 U.S.C. §§ 1106(b)(1) and 1109(a))**

129. Aramark realleges and incorporates by reference each and every allegation contained herein.

130. Aramark brings this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(b)(1), and 1109(a). Aramark has standing to bring this Claim under these provisions because they are ERISA fiduciaries.

131. As claims administrator for the Plans, Independence was a fiduciary under ERISA and thus owed fiduciary duties to Aramark. ERISA forbids a fiduciary from engaging in self-dealing. *See* 29 U.S.C. § 1106(b)(1).

132. Independence controlled the adjudication, pricing, repricing, reprocessing, and payment of health care provider claims through an adjudication process.

133. As a fiduciary, Independence was required, among other things, to discharge its duties solely in the interest of the participants and beneficiaries of the Plans, to preserve the Plans' assets, and to disclose fully its actions and any compensation it was taking for its services.

134. As set forth herein, Independence breached its fiduciary duties by engaging in a variety of wrongful acts and practices.

135. Additionally, Independence made profits of an undetermined amount due to its breach of duty of loyalty and care.

136. Accordingly, Aramark seeks (i) the recovery of any and all losses resulting from Independence's breach of its fiduciary duty, (ii) the recovery of any and all profits or benefit that Independence made as a result of its breach of its fiduciary duty, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Aramark's attorneys' fees and costs.

137. These damages constitute "appropriate equitable relief" in the form of surcharge under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). *See CIGNA Corp. v. Amara*, 563 U.S. 421, 441-42 (2011).

## COUNT FOUR

### Prohibited Transactions Under ERISA
### (29 U.S.C. §§ 1106(b)(3) and 1109(a))

138. Aramark realleges and incorporates by reference each and every allegation contained herein.

139. Aramark brings this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3) and 1109(a). Aramark has standing to bring this Claim under these provisions as ERISA fiduciaries.

140. As claims administrator for the Plans with discretion over Plan administration and Plan assets, Independence was a fiduciary under ERISA. As a fiduciary, Independence was prohibited from "receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the plan." See 29 U.S.C. § 1106(b)(3).

141. By retaining the difference between the negotiated price for medical services rendered and the monies withdrawn from the Plans and collecting "savings" and "reprocessing" fees, Independence received consideration from parties transacting with the Plans constituting "prohibited transactions." Among other things, Independence used its control of the assets of the Plans, the negotiation of the price paid for medical services, and the engagement of "repricing" companies to improperly receive and retain monies from the Plans.

142. Independence retained for itself and transferred to itself monies from the Plans to which it had no lawful right.

143. Neither the Plans nor Aramark received adequate consideration for the amounts that were paid for these prohibited transactions.

144. Accordingly, Aramark seeks (i) the recovery of any and all losses resulting from Independence having engaged in prohibited transactions, (ii) the recovery of any and all profits that Independence made as a result of having engaged in prohibited transactions, (iii) all such other equitable or remedial relief as the court may deem appropriate, and (iv) the recovery of Aramark's attorney's fees and costs.

145. These damages constitute "appropriate equitable relief" in the form of surcharge under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). *See CIGNA Corp. v. Amara*, 563 U.S. 421, 441-42 (2011).

**COUNT FIVE**

**Declaratory Relief**

146. Aramark realleges and incorporates by reference each and every allegation contained herein.

147. HIPAA regulations require that electronic remittance advice, or an 835, be transmitted to the provider's office and maintained by Independence in the standard or original format for auditability. As a covered entity, Independence should have complied with the HIPAA regulations.

148. Independence did not provide Aramark with the 835s for the medical claims Independence processed despite Independence agreeing to make available claim data, claim settlements and periodic reports at no additional charge as per the Agreements. Independence has failed to satisfy its contractual obligations to provide requested claims data.

149. Without this data, the Plans were unable to assess Independence's handling of the Plans' funds and associated payment integrity. The Plans own this data and have an absolute right to it.

150. Accordingly, Aramark seeks a declaration ensuring that an employer, plan sponsor, or trust (if applicable) or appropriate designee (bound by any requirements respecting HIPAA-protected information) shall have unfettered access to any 835 or electronic remittance advice regarding any plan participant healthcare encounter;

## PRAYER FOR RELIEF

WHEREFORE, Aramark respectfully requests that the Court issue a final judgment:

a. ordering Independence to reimburse Aramark for any and all losses resulting from Independence breaching its fiduciary duties and/or having engaged in prohibited transactions;

b. ordering Independence to disgorge to Aramark any and all profits that Independence made as a result of its breaches of fiduciary duties and/or having engaged in prohibited transactions;

c. declaring that Independence is a designated claim fiduciary and functional fiduciary under ERISA;

d. imposing a preliminary injunction compelling Independence to provide all Plan claims data (subject to appropriate privacy protections);

e. ordering Independence to identify Aramark and include its taxpayer identification number (or "TIN") in any 835 or electronic remittance advice transmitted directly to any healthcare provider or to any clearinghouse;

f. ordering a preliminary injunction ensuring that Aramark or appropriate designee (bound by any requirements respecting HIPAA-protected information) shall have unrestricted access to any 835 or electronic remittance advice regarding any plan participant healthcare encounter;

g. granting all such other equitable or remedial relief as the Court may deem appropriate;

h. ordering Independence to pay Aramark incurred attorneys' fees and costs;

i. ordering an accounting, and;

j. ordering such other relief as the Court may deem proper and just.

## JURY DEMAND

Plaintiffs hereby request a trial by jury as to all counts so triable.

Dated: March 13, 2026

Respectfully Submitted,

/s/ *Lawrence H. Pockers*
Lawrence H. Pockers (PA No. 84589)
Sarah O'Laughlin Kulik (PA No. 318534)
Nina Kalandadze (PA No. 329064)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Fax: (215) 979-1020
Email: lhpockers@duanemorris.com
sckulik@duanemorris.com
nkalandadze@duanemorris.com

Jon Corey (D.C. Bar No. 491311)
(*pro hac vice* forthcoming)

MCKOOL SMITH, P.C.
1717 K Street NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 370-8300
Fax: (202) 370-8344
Email: jcorey@mckoolsmith.com

David I. Schiefelbein (NY Bar No. 4767398)
(*pro hac vice* forthcoming)
MCKOOL SMITH, P.C.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Fax: (212) 402-9444
Email: dschiefelbein@mckoolsmith.com

*Attorneys for Plaintiffs*