**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ARAMARK SERVICES, INC. f/k/a ARAMARK CORPORATION, et al.,<br>*Plaintiffs,*<br>v.<br>QCC INSURANCE COMPANY D/B/A INDEPENDENCE ADMINISTRATORS, et al.,<br>*Defendants.* | CIVIL ACTION<br>NO. 26-1664 |

**Pappert, J.** **August 13, 2026**

**MEMORANDUM**

Aramark Services, Inc., Aramark Services, Inc. Group Health Plan, Aramark Uniform Services Health and Welfare Plan, and Aramark Benefits Compliance Review Committee sued QCC Insurance Company, Independence Blue Cross, and Independence Health Group, Inc., alleging breaches of fiduciary duties (Counts I and III) and prohibited transactions (Counts II and IV) under the Employee Retirement Income Security Act and a claim for declaratory relief (Count V). Defendants moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6), as well as to strike Plaintiffs' demand for a jury.

After reviewing the parties' submissions and holding oral argument, the Court grants the motion in part and denies it in part. The Plans, IBC and IHG are dismissed without prejudice. Counts I through IV proceed, Count V is dismissed without prejudice, and the jury demand is stricken.

# I

## A

Aramark Services, Inc. provides food, facilities and uniform services to schools and businesses nationwide. (Compl. ¶ 9, Dkt. No. 1.) It offers medical insurance to its employees and their families through two welfare benefit plans—Aramark Services, Inc. Group Health Plan and Aramark Uniform Services Group Health and Welfare Plan—which are organized and operated under ERISA. (*Id.* ¶¶ 2, 10.) Both plans have more than $600 million in assets, and Aramark Benefits Compliance Review Committee acts as their plan administrator and designated fiduciary. (*Id.* ¶¶ 1, 13.)

Like many large employers, Aramark lacks the expertise to evaluate medical claims submitted by healthcare providers. (*Id.* ¶ 22.) So it conducted a competitive bid process in 2018 to hire a third-party claims administrator, or TPA, for the Plans. (*Id.*) Defendants allegedly told Aramark they had the expertise the Plans needed, and Aramark hired one of them, QCC Insurance Company, as TPA. (*Id.*) QCC is a wholly owned subsidiary of Independence Blue Cross, "the leading health insurance company in southeastern Pennsylvania" with more than eight million customers. (*Id.* ¶¶ 23, 105.) Independence Health Group, Inc. is the parent of both IBC and QCC. (*Id.* ¶ 14.)

Over their eight-year relationship, Aramark and QCC signed three agreements: (1) the 2018 Administrative Services Agreement ("ASA"), (2) the 2022 Administrative and Network Services Contract ("ANSC") and (3) the 2024 Renewal Agreement. (*Id.* ¶ 25.) QCC agreed under each, among other things, to process medical claims, screen out fraudulent or improper ones, interact with healthcare providers, determine how much providers should be paid, pursue subrogation where applicable, and collect

overpayments. *See* (*Id.* ¶¶ 3, 31, 34). Aramark in turn paid QCC a fee and "self-fund[ed]" medical expenses with plan assets. (*Id.* ¶¶ 3, 24.)

1

Starting in 2018, QCC agreed to "review and determine whether benefits are payable, and pay or deny claims for services incurred" by plan participants. (2018 ASA at Art. IV.A., Compl. Ex. 1, Dkt. No. 1-3.) The ASA provided that the "**<u>Claims Administrator is the Named Claims Fiduciary</u>**," (*id.* at Ex. F (emphasis in original)), and earlier defined QCC as the "Claims Administrator" and Aramark as the "Group," (*id.* at 1.) Aramark "delegate[d] claims fiduciary authority and responsibility" to QCC in exchange for a fee:

> In this regard, the Group delegates to the Claims Administrator the final discretionary authority regarding all decisions related to benefit determinations, claims payments and Subscriber appeals under the Benefit Program including, but not limited to, payment of claims for Covered Services, denial or non-payment of claims, and determination of the amount of payment due for claims for Covered Services, and the administration of all levels of Subscriber appeals . . . . Because the Group delegates claims fiduciary responsibility and authority to the Claims Administrator for the above functions, the Group shall have no authority to overturn or otherwise amend benefit determinations, claims payments, and subscriber appeal determinations made by the Claims Administrator.

(*Id.* at Ex. F.)

The parties agreed to other cost-saving measures. QCC had the "sole responsibility . . . to take reasonable steps to recover incorrect payment[s] or overpayment[s]," (*id.* at Art.IV.O), for which Aramark would receive credit against future claims costs less a recovery fee, *see* (*id.* at Art. IV.Q.1). It also would provide subrogation services, review claims for errors before and after payment, and coordinate benefits with the appropriate vendors and agencies. (*Id.* at Art. IV.K.)

2

Aramark entered into a similar agreement with QCC four years later. It appointed QCC as "administrative service agent . . . for purposes of providing administrative and claims services in connection with the Plan as specified in Exhibit B to this Contract, which is attached hereto and incorporated herein by reference." (2022 ANSC § 2.1, Compl. Ex. 2, Dkt. No. 1-4.) That section said "[t]he Plan Sponsor, and not Independence Administrators, shall be the administrator and claims fiduciary of the Plan for purposes of ERISA," (*id.*), but Exhibit B, confusingly, referred to QCC as the "named claims fiduciary of the Plan" with the "authority to exercise discretion" related to claims services, *see* (*id.* at Ex. B § 2.)

QCC also agreed to make "diligent attempt[s]" to recover overpayments, including those "made as a result of the fraudulent acts or omissions of a Participant or a provider." (*Id.* § 3.7.)

3

The parties renewed the ANSC in 2024 "based on [their] current benefits and funding arrangement." *See* (2024 Renewal Agreement at 11, Compl. Ex. 3, Dkt. No. 1-5). The renewal listed "Value Added Services" along with a fee and checkbox, (*id.* at 6–10), and stated "[t]he client will be responsible for the payment of fees relating to any services 'checked off' within this proposal," (*id.* at 15.) Aramark did not check off any of those services—including one for "Claims Fiduciary." (*Id.* at 6–10.)

B

Plaintiffs recently decided to audit QCC's performance. Based on a limited set of claims data, they discovered QCC had purportedly used plan assets to pay:

- High-value claims that could not have been adequately reviewed in time;
- Hundreds of claims with missing, invalid, or unlisted codes;
- 2,300 claims for services expressly excluded, including untimely claims, cosmetic surgery, telehealth services, and certain chiropractic services;
- Nearly 5,000 duplicate claims;
- Over 400 claims that cost more than Medicare or in-network prices for the same services;
- An unknown number of claims that could have been resolved through subrogation;
- 1,253 improper, false or fraudulent claims, such as payments to a pill mill scheme;
- 1,250 claims for unnecessary add-on testing;
- Claims for thirty-six "superusers" who went to the emergency room more than five times a year; and
- Claims related to "Rehab Riviera," a "well-known fraudulent billing scheme" for high-end rehabilitative services.

*See* (Compl. ¶¶ 58–77). Defendants "made tens of millions" off these claims at the Plans' expense. (*Id.* ¶ 58.)

Plaintiffs accuse Defendants of breaching their fiduciary duties and contractual obligations in other ways. They allegedly engaged in "cross-plan offsetting" by overpaying providers with plan assets but crediting recovered payments back to Independence's fully insured plans—not the Plans. (*Id.* ¶¶ 78, 80.) Defendants have supposedly used this practice for years, (*id.* ¶ 79), and disclosed it to Aramark four years into their relationship, *see* (*id.* ¶ 83). They also "moved funds" from the Plans into their own accounts, (*id.* ¶ 85), applied "less rigorous" standards to claims under the

Plans than under their fully insured plans, (*id.* ¶¶ 91, 95), misrepresented its fees, (*id.* ¶¶ 99–102), and refused to provide claims data to Plaintiffs, (*id.* ¶ 56.)

II

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads facts from which the Court can infer "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although this "plausibility standard is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Assessing plausibility under *Twombly* and *Iqbal* is a three-step process. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). Step one is to "take note of the elements the plaintiff must plead to state a claim." *Id.* (alterations omitted) (quoting *Iqbal*, 556 U.S. at 675). Next, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, for all "well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). If the well-pleaded facts do not nudge the "claims across the line from conceivable to plausible," the Court must dismiss the complaint. *Twombly*, 550 U.S. at 570.

III

Aramark and the Committee plausibly allege ERISA claims against QCC. Defendants argue otherwise for four reasons: First, they contend three of the four Plaintiffs lack "statutory standing" to bring claims. (Defs.' Mem. of L. at 19–22, Dkt. No. 31.) Second, Defendants claim they "are not plausibly fiduciaries in connection with Plaintiffs' grievances." (*Id.* at 27–34.) Third, Plaintiffs supposedly don't allege a breach of an ERISA-imposed duty or losses to the plan as required under 29 U.S.C. § 1132(a)(2). (*Id.* at 22–24); (Defs.' Second Not. of Supp. Auth. at 2, Dkt. No. 40.) Fourth, 29 U.S.C. § 1132(a)(3) purportedly doesn't provide the relief sought as a matter of law. (*Id.* at 24.)

A

As an initial matter, "statutory standing" is a misnomer. The Supreme Court has called the term "misleading, since the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014); *Nat'l Health Plan Corp. v. Teamsters Loc. 469*, 585 F. App'x 832, 834–35 (3d Cir. 2014) (warning against using "statutory standing" in the context of ERISA). The issue instead is whether Plaintiffs "fall[] within the class of plaintiffs whom Congress has authorized to sue." *Lexmark*, 572 U.S. at 128.

Section 1132 allows certain plaintiffs to sue for ERISA violations. Relevant here, a civil action may be brought:

> (2) by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; or

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(2)–(3). Plaintiffs bring their claims as "ERISA fiduciaries." (Compl. ¶¶ 111, 121, 130, 139.)

The Court "start[s] from the standpoint that . . . ERISA broadly defines a fiduciary." *Curio v. John Hancock Mut. Life Ins.*, 33 F.3d 226, 233 (3d Cir. 1994). An entity can become a fiduciary in three ways: "(1) being named as the fiduciary in the instrument establishing the employee benefit plan, (2) being named as a fiduciary pursuant to a procedure specified in the plan instrument . . . and (3) being a fiduciary under the provisions of 29 U.S.C. § 1002(21)(A)." *Glaziers & Glassworkers Union Loc. No. 252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1179 (3d Cir. 1996) (citation modified). Section 1002(21)(A) provides that a person qualifies as a "fiduciary" with respect to a plan to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.* § 1002(21)(A). An entity not named in the plan documents can still become a "functional fiduciary" under this provision "by virtue of the authority [it] holds over the plan." *Teets v. Great-West Life & Annuity Ins.*, 921 F.3d 1200, 1206 (10th Cir. 2019).

To be a functional fiduciary, an entity must "act[] in the capacity of manager, administrator, or financial advisor to a 'plan.'" *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins.*, 768 F.3d 284, 291 (3d Cir. 2014) (quoting *Pegram v. Herdrich*,

530 U.S. 211, 222 (2000)). This type of fiduciary is "contextual" and arises "only to the extent" a person acts in an administrative, managerial or advisory capacity to an employee benefits plan. *Id.* (quoting *Pegram*, 530 U.S. at 226). So "the threshold question is . . . whether that person was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint." *Id.* at 291–92 (quoting *Pegram*, 530 U.S. at 226).

Defendants "do not challenge the fiduciary status" of the Committee, but do so with respect to the Plans and Aramark. (Defs.' Mem. of L. at 19–20, 22.)

1

Plaintiffs fail to allege facts plausibly showing the Plans were fiduciaries. None of the agreements between the parties name either plan as a fiduciary, nor were they named fiduciaries pursuant to a procedure specified in those agreements. Plaintiffs never identify any authority or control—discretionary or otherwise—the Plans had over themselves or their assets. They only allege Independence administered the Plans, (Compl. ¶ 2), breached their fiduciary duties to them, (*id.* ¶¶ 30–40), and improperly paid claims using plan assets, (*id.* ¶ 36.)

Plaintiffs say the Plans are proper parties because their claims "are *derivative*; the statute 'repeatedly identifies the 'plan' as the victim of any fiduciary breach and the recipient of any relief.'" (Pls.' Resp. in Opp'n at 18 (quoting *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 254 (2008)), Dkt. No. 31.) None of that matters. Being the victim of a fiduciary breach or the recipient of relief did not somehow make the Plans fiduciaries, let alone confer them with any authority or control. *See Glaziers*, 93 F.3d at 1179. And the quote they cite was in reference to a different ERISA provision that has

no bearing on the definition of "fiduciary." *See LaRue*, 552 U.S. at 254 (citing 29 U.S.C. § 1109(a)).

2

The same is not true, however, for Aramark. An employer that is also a plan sponsor like Aramark can become an ERISA fiduciary "to the extent it retains or exercises any of the responsibilities listed in the definition of a 'fiduciary.'" *See Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1464–65 (4th Cir. 1996). The power "to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of the plan within the meaning of § 1002(21)(A)." *Id.* at 1465 (collecting cases). Such employers also "ha[ve] a duty to monitor appropriately the administrators' action[s]." *Ed Miniat, Inc. v. Global Life Ins. Grp.*, 805 F.2d 732, 736 (7th Cir. 1986). Indeed, "[f]ailure to utilize due care in selecting and monitoring a fund's service providers constitutes a breach of a trustee's fiduciary duty." *Liss v. Smith*, 991 F. Supp. 278, 300 (S.D.N.Y. 1998) (collecting cases).

Aramark exercised discretionary authority and control over the Plans. It appointed QCC as TPA after a competitive bid process, (Compl. ¶ 22), and retained them for nearly eight years, *see* (*id.* ¶ 25). It also monitored QCC's performance and purportedly learned it had wasted plan assets by paying improper, fraudulent and unnecessary claims. *See* (*Id.* ¶¶ 58–77). These allegations serve as the basis for many of Aramark's claims and "relate to [its] own fiduciary responsibility" to appoint, retain and monitor a TPA for the Plans. *Coyle*, 98 F.3d at 1466.

Defendants believe Aramark can't be a fiduciary because it "passed fiduciary status to its appointed Committee," (Defs.' Mem. of L. at 21), but nothing in ERISA

precludes both from being fiduciaries. To the contrary, § 1002(21)(A) defines "fiduciary" "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). Much like other plan sponsors, Aramark exercised discretionary authority and control over its employee benefit plans. *See, e.g.*, *Coyle*, 98 F.3d at 1466 & n.10 (finding a plan sponsor was a functional fiduciary because it monitored a TPA's performance); *Ed Miniat*, 805 F.2d at 736 (finding a plan sponsor was a functional fiduciary because it had "the power to select" a TPA and "may well have some duty to monitor [its] actions"); *Leigh v. Engle*, 727 F.2d 113, 133 (7th Cir. 1984) (finding a plan sponsor was a functional fiduciary "in selecting and retaining plan administrators").

B

With respect to Defendants, QCC was plausibly a fiduciary but IBC and IHG were not. For each of their claims, Plaintiffs must "plausibly allege that [Defendants were] 'fiduciar[ies] with respect to' the Plan[s] when [they] engaged in the complained-of conduct." *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Mich.*, 138 F.4th 457, 463 (6th Cir. 2025); *see also* 29 U.S.C. § 1104(a)(1) ("[A] fiduciary shall discharge his duties with respect to a plan . . . ."); *id.* § 1106(a)(1) (imposing liability on "[a] fiduciary with respect to a plan" who engages in prohibited transactions); *id.* § 1106(b) (same). They say Defendants were fiduciaries in three ways: (1) they were named claims fiduciaries, (2) they had discretionary authority over plan administration and plan assets and (3) they controlled plan assets when adjudicating, paying and recovering claims. *See* (Pls.' Mem. of L. at 18, 20, 23).

1

"Every employee benefit plan . . . shall provide for one or more named fiduciary who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). The "named fiduciary" is a "fiduciary who is named in the plan instrument." *Id.* § 1102(a)(2); *Glazier*, 93 F.3d at 1179 (holding that an entity can become a fiduciary by "being named in the instrument establishing the employee benefit plan"). The parties dispute whether QCC was a named fiduciary under the plan instruments but never address IBC or IHG.

a

The 2018 ASA named QCC as claims fiduciary. The parties agreed that the "**Claims Administrator is the Named Claims Fiduciary**," (2018 ASA at Ex. F (emphasis in original)), and Aramark "delegate[d] claims fiduciary authority and responsibility" to QCC:

> In this regard, the Group delegates to the Claims Administrator the final discretionary authority regarding all decisions related to benefit determinations, claims payments and Subscriber appeals under the Benefit Program including, but not limited to, payment of claims for Covered Services, denial or non-payment of claims, and determination of the amount of payment due for claims for Covered Services, and the administration of all levels of Subscriber appeals . . . .

(*Id.*) Another part reiterated QCC's responsibilities as "named claims fiduciary." (*Id.* at Ex. AA.)

Defendants cannot limit the ASA as they try to do. They single out two parts of the agreement, "determinations" and "payment of claims for Covered Services," and conclude they were only named fiduciary for services covered under the Plans and calculations used for claims payments. *See* (Defs.' Mem. of L. at 29–30). But QCC was

named fiduciary for "all decisions related to benefit determinations, claims payments and Subscriber appeals under the Benefit Program," (2018 ASA at Ex. F), not just the parts they cite. Plaintiffs allege facts showing QCC dissipated plan assets and failed to provide cost-saving services, *see* (Compl. ¶¶ 58–77, 83, 93–95), both of which "relate[] to" its obligations under the ASA, *see* (2018 ASA at Ex. F).

b

QCC was plausibly a named fiduciary under the ANSC as well. That agreement provided that "[t]he Plan Sponsor, and not Independence Administrators, shall be the administrator and claims fiduciary of the Plan for purposes of ERISA." (2022 ANSC § 2.1.) But Exhibit B, which was "incorporated" into the contract, stated QCC was "named claims fiduciary of the Plan." (*Id.* § 2.1 & Ex. B § 2.)

These inconsistencies create factual disputes about QCC's fiduciary status that need not be resolved now. "[I]f the parties dispute the facts that establish the defendant's fiduciary status . . . then the issue should not be resolved at the motion to dismiss stage." *Edmonson v. Lincon Nat'l Life Ins.*, 777 F. Supp. 2d 869, 884–85 (E.D. Pa. 2011). Again, "ERISA broadly defines fiduciary," *Curio*, 33 F.3d at 233, and "[f]urther development is required [because] on this record [the Court] cannot say that, as a matter of law, [QCC] is not a fiduciary," *Bd. of Trs. of Bricklayers & Allied Craftsmen Loc. 6 of N.J Welfare Fund v. Wettlin Assocs. Inc.*, 237 F.3d 270, 275 (3d Cir. 2001).

c

QCC was a named fiduciary under the 2024 Renewal Agreement for similar reasons. The Complaint allows for the inference that the renewal was a continuation of

the 2022 ANSC, *see* (Compl. ¶¶ 25, 28), under which QCC was plausibly a named fiduciary. Defendants insist QCC is not a named fiduciary because Plaintiffs left that service "unchecked," (Defs.' Mem. of L. at 31–32), but this discrepancy is not dispositive for reasons already explained, *see supra* subsection III.B.1.b.

2

Even if QCC was not a named fiduciary, it was still a functional fiduciary. Such an entity "has any discretionary authority or discretionary responsibility in the administration of [a] plan." *See* 29 U.S.C. § 1002(21)(A)(iii). "The ordinary trust law understanding of 'fiduciary' administration of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents." *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996); *see* 29 U.S.C. § 1002(16)(A)(i) (defining "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated"). When plan documents require performance "in a specific manner," ERISA's fiduciary duties are not implicated. *Edmonson v. Lincoln Nat'l Life Ins.*, 725 F.3d 406, 422 (3d Cir. 2013). But when the plan "permits some leeway in how an act is performed, then the discretionary choice on how to perform that act" triggers fiduciary status. *Id.*

Plaintiffs plausibly allege QCC had discretionary authority and responsibility in plan administration. The ASA granted it "final discretionary authority regarding all decisions related to benefit determinations, claims payments and Subscriber appeals under the Benefit Program." (2018 ASA at Ex. F.) Aramark had "no authority to overturn or otherwise amend" those decisions. (*Id.*) Four years later, Aramark appointed QCC "administrative service agent . . . of the Plan for purposes of providing

administrative and claims services in connection with the Plan." (2022 ANSC § 2.1.) That included "the authority to exercise discretion to" "make a Determination with respect to each Claim as soon as practicable following receipt of such claim" and "conduct an investigation into the validity of each claim as it deems reasonable." (*Id.* at Ex. B § 2.1–2.) The ANSC defined "Determination" as "a decision by Independence Administrators as to whether and to what extent such Claim shall be paid, subject to the review and final determination of the Plan Sponsor." (*Id.* at 2.) The parties renewed that agreement in 2024 "based on [their] current benefits and funding arrangement." (2024 Renewal Agreement at 11.) So each plan document gave QCC "some leeway" in providing claims services, *Edmonson*, 725 F.3d at 422, which it allegedly exploited to pay improper claims, cross-plan offset, comingle funds, and apply less rigorous standards than for its fully insured plans.

Defendants make several counterarguments, none of which succeed. They believe QCC couldn't exercise discretion because it never had "final authority over something without appeal to the plan administrat[or]," *see* (Aug. 4, 2026 Hr'g Tr. at 57:17–18), and, even so, Plaintiffs must allege more than "making mistakes" in claims determinations, *see* (Defs.' Mem. of L. at 32–33). But a functional fiduciary only needs "any discretionary authority or discretionary responsibility"—not final decision-making authority. 29 U.S.C. § 1002(21)(A)(iii); *see also Confer*, 952 F.2d at 38 (finding discretionary authority where the defendant had "principal responsibility for the management and administration of the Plan"); *Humana Health Plan, Inc. v. Nguyen*, 785 F.3d 1023, 1030 (5th Cir. 2015) ("We do not hold . . . that a third-party service provider must have final decision-making authority to be an ERISA fiduciary."); *Mass.*

*Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 327 (1st Cir. 2023) (same). In any event, each agreement gave QCC discretion to decide whether to pay claims and at what amount. *See* (2018 ASA at Ex. F); (2022 ANSC at Ex. B § 2) (2024 Renewal Agreement at 11). As counsel acknowledged, QCC did "what it believe[d] [was] reasonable" and had "the ability to choose among a range of things." (Aug. 4, 2026 Hr'g Tr. at 58:10–11, 58:20.) Because QCC "ha[d] authority to grant or deny the claims," it was "an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii)." *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1035 (6th Cir. 1993).

As for IBC and IHG, Plaintiffs never mention what authority or responsibility they had in plan administration. They conclusorily allege QCC was a subsidiary of both, *see* (Compl. ¶¶ 14–15), and IBC helped develop QCC's practices and policies, *see* (*id.* ¶ 23).

3

QCC was a functional fiduciary in another way: It "exercise[d] any authority or control respecting management or disposition of [plan] assets." 29 U.S.C. § 1002(21)(A)(i). Plan assets are "property owned by an ERISA plan," *Sec'y of Lab. v. Doyle*, 675 F.3d 187, 203 (3d Cir. 2012), and "include any property, tangible or intangible, in which the plan has a beneficial ownership interest," *Edmonson*, 725 F.3d at 427 (citation omitted). Unlike other parts of ERISA, this provision does not require discretion—"any" authority or control will do. *See Bricklayers*, 237 F.3d at 272–73. Congress thus "established a lower threshold for fiduciary status where control of assets is at stake." *Id.*

Plaintiffs clear that low threshold. QCC agreed in 2018 to "review and determine whether benefits are payable, and pay or deny claims for services incurred by Subscriber of the Group under the Benefits Program." (2018 ASA at Art. IV.A.) Aramark "entirely funded" "health benefits provided under the Benefit Program" and "retain[ed] the ultimate responsibility for payment of claims and other expenses." (*Id.* at Art. VII.B.) The parties subsequently agreed:

> Independence Administrators shall provide a checking account through which benefit payments shall be made under the Plan. Independence Administrators shall have sole authority to sign checks on the Account. Independence Administrators shall notify the Plan Sponsor and/or its designated vendor at reasonable intervals of the amount needed to cover Claims approved by Independence Administrators, and Independence Administrators shall pay such Claims as soon as is practical . . . . Any balance in the Account shall be the property of the Plan or the Plan Sponsor if the Plan is unfunded.

(2022 ANSC § 2.2.) The parties renewed the ANSC in 2024. *See* (Compl. ¶ 25); (2024 Renewal Agreement at 11). QCC thus "had the authority to write checks on the Plan account" and exercised "control over where Plan funds were deposited." *Tiara Yachts*, 138 F.4th at 464 (citation omitted). But it allegedly "squandered Plan assets" by paying claims that were improper, fraudulent or unnecessary. *See id.*

Defendants say QCC could not have wasted "plan assets" because the payments came from Aramark, but the allegations and agreements belie that argument. QCC paid claims "with funds transferred from the Plans into accounts controlled by Independence" and "pull[ed]" money from the Plans for claims expenses. (Compl. ¶ 36.) The plan documents confirm QCC made payments based on costs associated with the Plans, *see* (2018 ASA at Art. IV.A); (2022 ANSC § 2.2); (2024 Renewal Agreement at 11), which is enough, for now, to establish a beneficial ownership interest, *see*

*Edmonson*, 725 F.3d at 427. Although it's unclear which "specific assets are plan assets," that "factual inquiry" is better suited for summary judgment. *See id.* at 428.

With respect to IBC and IHG, Plaintiffs never allege what authority or control they had over plan assets.

C

Defendants next contend, unsuccessfully, that Plaintiffs don't state claims under 29 U.S.C. § 1132(a)(2). To do so, they must allege: "(1) a plan fiduciary (2) breache[d] an ERISA-imposed duty (3) causing a loss to the plan." *Leckey v. Stefano*, 501 F.3d 212, 225–226 (3d Cir. 2007). Only (2) and (3) remain at issue.

1

Defendants apparently object to the breach of their duty of prudence alleged in Count I.[1] (Defs.' Reply at 8 n.1, Dkt. No. 34); (Defs.' Second Not. of Supp. Auth. at 2–3.) Such a breach is "largely a process-based inquiry" with two steps. *Quest Diagnostics*, 179 F.4th at 226 (citation omitted). "First, if the fiduciary's process was prudent, that ends the inquiry and plaintiffs lose. Second, if the process was imprudent, [the Court] must ask whether a 'hypothetical prudent [fiduciary]' would have 'made the same decision anyway.'" *Id.* (citation omitted). Because a fiduciary often makes "difficult tradeoffs," a plaintiff "must plausibly allege fiduciary decisions outside a range of

[1] Defendants raised this argument through a notice of supplemental authority and said a recent Third Circuit case, *In re Quest Diagnostics ERISA Litigation*, 179 F.4th 217, 226 (3d Cir. 2026), was "especially pertinent" to whether they were fiduciaries. *See* (Defs.' Second Not. of Supp. Auth. at 2–3). That case had nothing to do with fiduciary status. *See* 179 F.4th at 229 ("[N]o one disputes that [the parties] are fiduciaries . . . ."). Although Defendants cannot use a notice of supplemental authority to raise new arguments, *see Atkins v. Capri Training Ctr.*, No. 13-cv-6820, 2014 WL 4930906, at *10 (D.N.J. Oct. 1, 2014), this one has some relationship—however scarce—to their motion, *see* (Defs.' Mem. of L. at 18).

reasonableness." *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 184 (3d Cir. 2024) (citation omitted).

Plaintiffs allege facts indicating QCC used an imprudent process and acted outside a range of reasonableness. It paid claims at a rate that is "impossible to obtain complete medical records," (Compl. ¶ 60), with missing, invalid or unlisted codes, (*id.* ¶ 62), for excluded, fraudulent or unnecessary services, (*id.* ¶¶ 63–67, 71–75), without providing subrogation services, (*id.* ¶ 70), and at prices well in excess of Medicare and in-network services, (*id.* ¶ 69.) These allegations suggest QCC did not properly "review [claims] data," "analyze and understand the bases" for the decisions at issue, or "otherwise use a process that was reasonable under these circumstances." *See Quest Diagnostics*, 179 F.4th at 225. And a hypothetical prudent fiduciary would not act as QCC purportedly did and "fail[] to properly monitor [claims] and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015); *see also Tiara Yachts*, 138 F.4th at 464 ("'Failing to preserve assets' gives rise to fiduciary duties." (citation omitted)); *Hartsfield, Titus & Donnelly v. Loomis Co.*, No. 8-3329, 2010 WL 596466, at *3 (D.N.J. Feb. 17, 2010) ("By both failing to properly process claims and making payment on unqualified claims, [the defendant] breached its duty under its agreements and did not act with the care and prudence expected under the circumstances.").

2

Plaintiffs also plead losses to the Plans. They allege QCC paid improper claims, charged undisclosed fees, and engaged in cross-plan offsetting—all at the Plans' expense. *See* (Compl. ¶¶ 39, 83). By doing so, QCC "retained for itself and transferred to itself monies from the Plans" and "cost Aramark tens of millions of dollars."

*Compare* (Compl. ¶¶ 8, 125–26, 141) *with Ceres Terminal, Inc. v. United Healthcare Ins.*, No. 6-254, 2006 WL 8457649, at *5 (D.N.J. May 18, 2006) (dismissing ERISA claims because "there are no allegations by plaintiff of harm . . . to the Plan itself").

D

Defendants lastly argue surcharge, disgorgement and accounting are unavailable under 29 U.S.C. § 1132(a)(3), but that too is incorrect. Section 1132(a)(3) is a "'catchall' provision[]" that "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132(a)(2)] does not elsewhere adequately remedy." *Varity*, 516 U.S. at 512. "Equitable relief" refers to "those categories of relief that were *typically* available in equity" before the fusion of courts of equity and courts of law. *Mertens*, 508 U.S. at 256.

1

Plaintiffs can seek surcharge because it was typically available in equity. Surcharge is "relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011). Prior to the merger of law and equity, this remedy was "exclusively equitable" and "extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." *Id.* at 442. The Supreme Court thus held surcharge "fall[s] within the scope of the term 'appropriate equitable remedy' in [§ 1132(a)(3)]." *Id.*

Defendants cite two recent circuit cases that rejected surcharge and downplay *Amara* as "*dictum*." *See* (Defs.' Mem. of L. at 24–25); (Aug. 4, 2026 Hr'g Tr. at 70:21–23, 71:5–7). But *Amara* did not change the interpretation of "appropriate equitable

relief" under § 1132(a)(3). *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 148 n.3 (2016). The Supreme Court has never held surcharge is inconsistent with that interpretation, nor has it since adopted a different approach. *See id.* To the contrary, *Amara* approved "make-whole relief" because the defendant—like QCC—acted as a fiduciary when it committed the purported breach of trust. *See* 563 U.S. at 442 (finding this distinction made a "critical difference" compared to prior cases). Even if that was *dicta*, the Court cannot "lightly ignore [its] force" because the Supreme Court "uses *dicta* to help control and influence the many issues it cannot decide." *United States v. Quinn*, 728 F.3d 243, 256 (3d Cir. 2013) (citation omitted). Most courts confronting this issue follow *Amara*, and Defendants offer little reason to do otherwise. *See Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 914–15 (11th Cir. 2022); *Sullivan-Mestecky v. Verizon Commc'ns Inc.*, 961 F.3d 91, 102–03 (2d Cir. 2020); *Moyle v. Liberty Mut. Ret. Benefit Plan*, 823 F.3d 948, 960 (9th Cir. 2016); *Silva v. Metro. Life Ins*, 762 F.3d 711, 722 (8th Cir. 2014); *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450–52 (5th Cir. 2013); *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 879–82 (7th Cir. 2013); *Berkelhammer v. ADP Totalsource Grp., Inc.*, No. 20-cv-5696, 2025 WL 3728533, at *5 (D.N.J. Aug. 4, 2025) ("[A] majority of district courts considering ERISA claims against fiduciaries . . . hold[] that the compensation Plaintiffs seek from Defendants . . . is akin to a 'surcharge' and is therefore equitable relief." (citation omitted)).

2

Disgorgement and accounting are available too. Those are "essentially the same remedy" and seek "[r]estitution measured by the defendant's wrongful gain."

*Edmonson*, 725 F.3d at 419. Restitution lies in equity "if the action seeks 'to restore to the plaintiff particular funds or property in the defendant's possession,' as opposed to seeking to impose personal liability on the defendant." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 235 (3d Cir. 2009) (quoting *Great–West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 214 (2002)). Plaintiffs must "identify[] the profit generating property or money wrongly held by [Defendants]" to recover profits from them as a form of equitable relief. *Id.* at 238.

Plaintiffs allege Defendants made "tens of millions of dollars" off their breaches, (Compl. ¶ 8), including $2,380,000 in advance funding, (2022 ANSC at Ex. D), recovery service fees, (*id.* at 7, 30), interest on "additional compensation," (*id.* § 2.2), savings from cross-plan offsetting, (Compl. ¶¶ 78–84), and other funds they "siphoned" from the Plans for undisclosed fees, (*id.* ¶ 38.) The Complaint thus identifies money wrongly held by Defendants and subject to disgorgement. *See, e.g.*, *Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193, 214 (3d Cir. 2004) (permitting disgorgement where the plaintiff named "the ERISA plans that withheld [his] benefits for several years and profited with respect to withholding those benefits"); *Zirbel v. Ford Motor Co.*, 980 F.3d 520, 524 (6th Cir. 2020) (permitting disgorgement where the plaintiff sought "the amount of the overpayment" from a beneficiary who received an oversized pension payment).

IV

Count V, on the other hand, is not properly pled. Plaintiffs "seek[] a declaration ensuring that an employer, plan sponsor, or trust (if applicable) or appropriate designee . . . shall have unfettered access to any 835 or electronic remittance advice regarding any plan participant healthcare encounter." (Compl. ¶ 150.)

Plaintiffs provide no basis for this claim. To the extent they rely on the Declaratory Judgment Act, that statute "is procedural only," *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240 (1937), and does not provide a standalone claim, *see Jones v. ABN AMRO Mortg. Grp., Inc.*, 551 F. Supp. 2d 400, 406 (E.D. Pa. 2008). Nor does § 1132(a)(3) help them because they never cited that provision in Count V. (Compl. ¶¶ 145–50.) In any event, counsel stipulated to dismissing this claim without prejudice. (Aug. 4, 2026 Hr'g Tr. at 51:22–24.)

V

Plaintiffs are also not entitled to a jury trial—as counsel recognized during oral argument. (*Id.* at 52:19–23.) The Seventh Amendment guarantees in "[s]uits at common law . . . the right of trial by jury shall be preserved." U.S. Const. amend. VII. That right includes statutory claims that are "legal in nature" but not those that are equitable. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53–55 (1989). Because Aramark "only" seeks "equitable and non-monetary relief," (Compl. ¶ 20), it cannot demand a jury trial¸ *see Pane v. RCA Corp.*, 868 F.2d 631, 636 (3d Cir. 1989); *Berkelhammer v. ADP Totalsource Grp., Inc.*, No. 20-cv-5696, 2024 WL 5220126, at *2 (D.N.J. Dec. 26, 2024) (collecting ERISA cases striking jury demands).

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***

Gerald J. Pappert, J.